# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WILLIAM R. NEAL,

   Plaintiff,

vs.              No. CIV 03-0648 JB/RHS

SANDIA NATIONAL LABORATORIES,
a U.S. government-owned-contractor-operated
facility,

   Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Sandia Corporation's Motion for Summary Judgment and Memorandum in Support Thereof, filed April 6, 2004 (Doc. 54). The primary issue is whether Plaintiff William R. Neal offered evidence creating a genuine issue of material fact whether Sandia's reasoning for not interviewing or hiring him was pretext, constituting unlawful intentional age discrimination under the Age Discrimination Employment Act of 1967, 29 U.S.C. §§ 621-34 ("ADEA"). Because the Court finds that Neal fails to establish a genuine issue of material fact as to pretext, the Court will grant the Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

Neal alleges (i) that Sandia's failure to hire him violated the ADEA, asserting that he was not hired as a result of an alleged Sandia policy of giving preferential consideration and employment to job applicants who graduated from college within three years of applying, see Complaint ¶¶ 9-11, at 2, filed May 29, 2003 (Doc. 1); (ii) that this policy has a disparate impact on members of the protected age class, see Initial Pre-Trial Report ("IPTR") at 1-2, filed September 11, 2003 (Doc. 19);

(iii) that the disparate impact is evidence of intentional unlawful discrimination in violation of the ADEA, see Plaintiff's Response to Defendant's Motion for Summary Judgment at 1-2, filed April 30, 2004 (Doc. 61)(hereinafter "Response"); and (iv) Sandia applies its minimum Grade Point Average ("GPA") requirements in a discriminatory fashion, indicating intentional age discrimination against a protected class, see id. ¶¶ 4, 6, at 2-5.

## I.   **EMPLOYMENT AT SANDIA.**

Sandia classifies an employee by the nature of the work performed, as well as by the category of employment.  See Declaration of G. Gordon Graham ¶ 4, at 2 (executed March 31, 2004) (hereinafter "Graham Decl."name).  A Sandia applicant who becomes a "regular hire," i.e., hired "permanently" and without any time limitation upon employment, is known within Sandia as a Full Time Employee ("FTE").  See Graham Decl. ¶ 5, at 2.  An FTE counts within Sandia against a department's "head count" staffing budget.  See id.

An applicant whom Sandia hires for a fixed period of time is called a Limited Term Employee ("LTE").  See id. ¶ 6, at 2.  An LTE is not a regular hire or a so-called "permanent" employee, and does not count within Sandia against a department's "head count" budget.  See id. A Sandia professional level administrative employee (including buyers) is known as a Member of Laboratory Staff ("MLS").  See id. ¶ 7, at 2.  A professional level engineer or scientist at Sandia is known as a Member of Technical Staff or "MTS."  See id. ¶ 8, at 2.  In addition to Members of Laboratory Staff and Members of Technical Staff, Sandia also hires employees known as an Administrative Staff Assistant ("ASA").  See id. ¶ 9, at 2.  An ASA generally has less education and less training and/or experience than an MLS or MTS.  See id.

The buyer positions that Neal sought were in Sandia's Procurement and Logistics Center,

also known as Sandia Organization 10200, which David L. Palmer supervised.  See Declaration of

David L. Palmer ¶ 3, at 1 (executed March 31, 2004)(hereinafter "Palmer Decl."); Graham Decl. ¶

10, at 2.  Palmer is, and then was, Sandia's Director in charge of its Procurement and Logistics

Center, Organization 10200.  See Palmer Decl. ¶ 3, at 1.

## II.    SANDIA HIRING POLICIES AND PRACTICES.

On August 21, 2000, Executive Vice President Joan Woodward sent a memorandum to

Sandia Vice Presidents stating that the hiring for professional level positions -- MTS/MLS -- was

subject to several criteria.  See Woodward's Memorandum regarding FY 2002 Hiring Plan

Allocations, Expectations, and Approvals Process (hereinafter "Woodward Memo").  The first

criterium is a minimum Grade Point Average ("GPA") of 3.2 for bachelor's and 3.5 for master's and

Ph.D degrees.  See id. at 2.  In addition, there was an expectation that Sandia would hire 80 percent

of the professional staff at the entry level -- starting at Sandia shortly after receiving their most recent

degrees -- and no more than 20 percent would be experienced ("80/20 hiring policy").  See id. at 3.

The portion of Woodard's memorandum concerning applicants with recent education refers

to individuals who recently received a degree.  See Woodward Memo at 2, ¶ 5.  The memorandum

does not specify any age at which a recent graduate had to have received his or her degree.  See

Woodard Memo at 2, ¶¶ 1-6 (listing criteria, of which age is not one).  Therefore, it was the hiring

supervisors' understanding that, under this policy, it is not necessary that the applicant have received

the recent degree at or before any particular age.  See Graham Decl. ¶ 15, at 4.  Rather, an individual

could have obtained a degree or an additional degree at an advanced age and after a long work career.

See id.  Provided that he or she had recently received the latest degree, Sandia would consider him

or her an applicant with recent education, as opposed to an "experienced" applicant.  See id.

Nevertheless, Neal contends, based on the testimony of Gordon G. Graham, Sandia's manager in charge of Corporate Products and Services Procurements, that it was clearly understood by Sandia's procurement hiring team leader Graham that the recent graduation requirement was targeting individuals who went back to school for a graduate degree in their 20's. See Response ¶ 6(A), at 3. To support this proposition, Neal relied on an excerpt from Graham's deposition testimony. Sandia designated Graham to be its 30(B)(6) witness to testify on the factual background and policy considerations regarding Woodward's August 21, 2000 memorandum. Neal's counsel asked Graham at his deposition:

> Q. (Plaintiff's counsel) Unofficially have you spoken with other employees at Sandia that your understanding of Ms. Woodard's memo would eliminate older workers that had been in the work force for over three years?
>
> A. (Mr. Graham) Most – all I can do is answer — I'm trying to — I can't remember specific instances. I know the subject has come up. Does the subject of recent schooling eliminate older people? Because most older people don't go back to school. Most people get their degrees shortly, you know, in their 20s, the preponderance of them. So there aren't a lot of people out of their 20s that get graduate degrees. There's some, but not a lot.

Deposition of G. Gordon Graham at 96:7-18 (taken January 13, 2004)(hereinafter "Graham Depo."). Neal contends that Graham's adherence to a hiring policy, which he believes will eliminate older people "because most older people don't go back to school," is evidence of intentional age discrimination and an admission as to the policy's discriminatory intention. See Response ¶ 6(A), at 4.

According to Sandia's hiring supervisors, in or around November, 2000, the 80/20 hiring policy was made inapplicable to administrative – MLS – positions. See Palmer Decl. ¶ 6, at 2; Graham Decl. ¶¶ 13-14, 17-19, at 3-5. Neal does not introduce any evidence to dispute this fact, but

-4-

objects to the evidence that Sandia offers in support of this fact as hearsay and requests that the Court strike this fact, paragraph 6 of Palmer's Declaration, and paragraphs 13-14 and 17-19 of Graham's Declaration.

## III.   CHRONOLOGY OF APPLICATIONS.

Neal submitted his resume through Sandia's website to apply for a posted position as a MLS buyer in Sandia's procurement organization on November 21, 2001, June 24, 2002, and September 29, 2002.  See Graham Decl. ¶ 35, at 8.  The website application process works on a rolling basis, in which an applicant can submit a resume for a particular position.  See Transcript of Hearing 2:1 - 4:6 (hereinafter "Tr.").  The resumes accumulate until the hiring team reviews the resumes and decides which candidates to invite for interviews.  See id.

### A.   NOVEMBER APPLICATION.

Neal first submitted his resume to Sandia on November 21, 2001.  See Graham Decl. ¶ 35, at 8; E-mail from Neal Submitting Resume to Sandia (dated November 20, 2001).[1]  On November 19 and 20, 2001, Sandia conducted interviews for MLS buyer positions, four of which were hired.  See Graham Decl. ¶ 36, at 8; List of Successful Candidates - 11/21/01.  Sandia offered a position to one of those applicants, KSM,[2] on December 27, 2001.  See List of Successful Candidates - 11/21/01.  Sandia offered another applicant, DPS, a position on January 21, 2002.  See id.  Neal submitted his resume too late for Sandia to consider him for the MLS buyer positions that Sandia

---

[1]  The Court notes that the date listed on the resume Neal submitted to Sandia is dated Tuesday, November 20, 2001.  See Email from Neal Submitting Resume to Sandia.  Because no party disputes that Sandia received the resume on November 21, 2001, however, the Court will assume the date indicated on the email is not indicative of when Sandia "received" the resume.

[2]  Sandia refers to all applicants by their initials to protect their privacy.

filled based on the interviews it held on November 19 and 20, 2001.  See Graham Decl. ¶ 36, at 8. In other words, although Neal submitted his resume on November 21, 2001, Sandia did not considered him for the positions that Sandia eventually offered to KSM and to DPS.  See id. ¶ 37, at 8-9; Tr. at 4:9 - 5:21.

Three of the four successful candidates from the November 19th and 20th interviews had received their most recent degree within a year before his or her application to Sandia, and the fourth, KSM, received her graduate degree after Sandia hired her.  See List of Successful Candidates - 11/21/01.  All four were born after 1969, making each one under the age of 40 (above which is a protected class) at the time Sandia hired them.  Further, all of the successful candidates for the first position for which Neal had applied at Sandia started their graduate degree at 30 years or younger, which Neal contends affirms his allegations of the age discrimination impact of a recent graduate hiring preference.

### B.   SUBSEQUENT CONSIDERATIONS OF NEAL'S RESUME.

The first time the hiring procurement team considered Neal's resume was in May, 2002.  See Graham Decl. ¶¶ 37-38, at 8-9.  Sandia did not invite Neal for an interview because the hiring team concluded that he did not have sufficient quality or relevant previous experience as a buyer.  See id. The hiring team did not know of, or consider, Neal's age when they decided not to invite Neal for an interview.  See id. ¶¶ 47-49, at 12.  The resume before the hiring team contained only Neal's graduate GPA, and the hiring team did not inquire about his undergraduate GPA at that time.  See Email from Neal Submitting Resume to Sandia; Graham Decl. ¶¶ 38-39, at 9.  After not receiving an interview based on his applications submitted to Sandia, Neal filed an Equal Employment Opportunity Commission charge alleging unlawful age discrimination.  See Charge of

Discrimination Document (dated October 31, 2002)(hereinafter "EEOC Charge").

Upon learning of Neal's EEOC charge in the late fall of 2002, the procurement team decided to re-visit Neal's resume to evaluate whether they overlooked his qualifications the prior spring.  See id. ¶ 39, at 9.  The positions for which Neal submitted his resume on November 21, 2001, June 24, 2002, and September 29, 2002 were all LTE buyer openings.  See id. ¶ 40, at 10.  The positions for which the hiring team was interviewing in the fall of 2002, however, were for FTE buyers.  See id. The FTE positions require a minimum GPA of 3.2 for a bachelor's degree and 3.5 for a master's degree.  See id. ¶ 42, at 10; Woodward Memo.  Before granting Neal an interview, the hiring team decided to request a copy of Neal's undergraduate transcript to review his GPA.  See Graham Decl. ¶ 41, at 10.  Neal submitted his undergraduate transcript in January, 2003, which showed an undergraduate GPA of 2.85.  See id.; Neal's University of New Mexico Undergraduate Transcript. Because this GPA was well below Sandia's requirements for an FTE position, the hiring team decided not to interview Neal.  See Graham Decl. ¶ 42, at 10.

Sandia hired ten candidates for FTE positions.  See List of Successful Candidates - NM20362.  Of the ten candidates hired, seven had received their most recent degree within two years prior to the date of their application.  See id.  Another candidate, CDW, received her most recent degree four years before the date of application, but had been working as an LTE at Sandia right after receiving her graduate degree.  Because of this prior employment, she was included in the Woodward memo definition of an individual eligible for an entry level hiring preference.  According to Neal, all of the eight individuals considered recent graduates for the purpose of the hiring policy were 34 and under when hired.  See List of Successful Candidates - NM20362.

The two remaining successful candidates for FTE positions, however -- BDL and CBS --

were both over 45 years of age when hired and had considerable experience.[3]  See id.; BDL's Resume; CBS' Resume.  In addition, another candidate, SMG, was 43 when Sandia offered him an LTE position; he declined the position.  See List of Successful Candidates - 11/21/01.  Sandia offered SMG his LTE position on April 8, 2002.  BDL and CBS, whom Sandia hired for FTE positions, were offered the position on January 8, 2002 and on February 18, 2002, respectively.  See id.

## IV.   EVIDENCE OF HIRING POLICY'S DISCRIMINATORY EFFECT AND INTENTION.

To support his allegation that Sandia's policies were intentionally discriminatory, Neal offers three different theories that, according to Neal, create a genuine issue of a material fact of whether Sandia's reasons for not interviewing or hiring him are pretext.  First, Neal alleges that the 80/20 hiring policy applied to the positions he sought, and that such a policy had a disparate impact, thereby evidencing intentional age discrimination.  Next,  Neal asserts that, because the evidence supporting Sandia's policy is based on testimony by interested witnesses (Sandia's employees), it is up to the jury to decide the issue of credibility.  Finally, Neal contends that Sandia intentionally and unlawfully applied specific minimum GPA requirements such that younger applicants were placed in a better position than those applicants in the protected class.

_____

[3]  In Defendant Sandia's Reply to Plaintiff's Response Brief to Motion for Summary Judgment, Sandia refers to the position for which it hired BDL and CBS as LTE positions and references the List of Successful Candidates - NM20362.  See Defendant's Reply at 11.  This List, however, reflects the FTE positions that Sandia filled and, in their Response to Defendant's Motion for Summary Judgment, Neal refers to position 20362 as a full-time employment position.  See Response at 4.  The Court will, therefore, assume that Sandia, in its Reply, meant to refer to the positions that it offered to BDL and to CBS in 2002 as FTE positions.  See Reply at 11.

1.      __Application of the 80/20 Hiring Policy to LTE/FTE Positions.__

Without waiving his hearsay objections, Neal contends that the 80/20 hiring policy targets individuals substantially younger than Neal and that the policy was in effect when Neal applied for the LTE position in November, 2001, and remained in effect for the FTE MLS position for which Sandia considered Neal in November of 2002.

Neal alleges that the 80/20 hiring policy applied to the LTE MLS buyer position when he submitted his resume in November, 2001. According to Neal, Graham, the hiring team leader, did not know about the alleged discontinuance of the recent graduate hiring preference for MLS positions until after the hiring of the four recent graduates for the first position for which Neal applied in November, 2001. The List of Successful Candidates shows that Sandia hired all of the successful candidates between December 21, 2001 and January 23, 2002. See List of Successful Candidates - 11/21/01. Graham's alleged conversation with Clark indicating that the recent graduate hiring preference no longer applied to MLS positions did not allegedly occur until January 31, 2002. See Graham Decl. ¶ 18, at 4. Therefore, according to Neal, the 80/20 policy applied to the positions filled based on the interviews conducted in November, 2001.

Neal also alleges that Sandia was strictly adhering to the 80/20 hiring policy for the FTE MLS buyer position for which Sandia considered Neal in November, 2002, because, of the ten successful candidates for the FTE MLS positions, two had experience and Sandia considered eight entry level. See List of Successful Candidates - NM20362. Declarations by Graham and Palmer, however, both state that, based on the change in policy in November of 2000, their understanding was that the 80/20 hiring policy did not apply to any of the MLS buyer positions, either LTE or FTE. See Graham Decl. ¶¶ 17-19, at 4-5; Palmer Decl. ¶ 6, at 2. Sandia further supports its contention that

the 80/20 policy did not apply to MLS positions by compiling a chart in preparation for litigation which details the hiring results for fiscal years 2000 through 2003.  For the fiscal year 2002, during which time Neal submitted all three of his applications to Sandia, the chart shows the total percentage of "lab staff" hires (referring to MLS positions) with experience as 74.29 percent, whereas inexperienced, or recent graduates only accounted for 25.71 percent.  Sandia objects to the admissibility of this evidence, arguing that it is irrelevant and incomplete.  See Response ¶ 25, at 19.

### 2.     Credibility of Defendant Sandia's Witnesses.

Neal contends that Sandia's only evidence showing that it did not apply the recent graduate hiring preference to the positions Neal sought are the declarations of Graham and Palmer, both Sandia management employees.  Because of their relationship with Sandia, Neal alleges a jury should determine the issue of their credibility.

Neal alleges that Palmer's testimony, stating that he became aware in November, 2000, that the 80/20 hiring policy no longer applied to MLS positions, presents some disturbing factual implausibilities.  See Palmer Decl. ¶¶ 6, 13, at 2, 4.  Neal asks why, if Palmer knew in November, 2000, that the recent graduate hiring preference no longer applied to MLS positions, he did not communicate that to Graham, who was the hiring team leader under Palmer's direct supervision.  See Palmer Decl. ¶ 13, at 4.  Neal also questions why, if November, 2000, marked the end of the applying the 80/20 hiring policy to MLS positions, Graham found out fourteen months later through a telephone call from Clark, rather than from a communication from his supervisor, Palmer, or from Woodard.  Neal argues that a reasonable factfinder could conclude that, because Graham allegedly became aware in January, 2002, that the recent graduate hiring policy had changed for MLS positions, then the policy was in full effect up to that time and Palmer did not communicate any

-10-

alleged change to Graham.

With regard to the credibility of Graham, Neal contends that Graham testified falsely in his deposition on a material issue in the case, thereby bringing his credibility into question.  Graham testified that Neal did not receive an interview for position 20362 because his undergraduate GPA was too low, and that "to the best of his knowledge" all other individuals which did receive interviews for that position had at least the minimum GPAs for undergraduate and graduate degrees. See Graham Depo. at 76:19 - 77:3.  According to the List of Persons Selected for Interviews, which Sandia prepared in response to Plaintiff's interrogatory 9, Sandia selected CDW for an interview and hired her for a FTE buyer position, even though she did not have the required minimum GPA.  When asked about CDW, Graham acknowledged that he had personal knowledge that CDW was hired even though her GPAs were below the required minimum.  See id. at 77:11 - 79:5.  Further, Graham testified that he had tried to convert CDW to an FTE position on several prior occasions, but was unsuccessful because of her low GPAs.  See id.  In light of these facts, Neal contends that Graham knowingly testified falsely when he stated that all the individuals who interviewed for FTE buyer position had the required minimum GPAs.   According to Neal, this discredits Graham's reliability as to all his testimony, and creates a genuine issue of a material fact that must be resolved by a jury to decide.  See Response ¶ 18, at 13.

### 3.   Applicability and Enforcement of the GPA Requirements.

As discussed above, in the late fall of 2002, Sandia considered Neal for an interview for one of the ten openings as a FTE buyer -- position 20362.  See Graham Decl. ¶ 39, at 9.  Once, however, Sandia received Neal's undergraduate transcripts showing an undergraduate GPA of 2.85, Sandia decided not to interview Neal.  See id. at ¶¶ 41-42, at 9; Graham Depo. at 75:14-15.  While his 2.85

undergraduate GPA was below the required minimum undergraduate GPA of 3.2, Neal's graduate

GPA of 3.52 was above the minimum 3.5 required.  See Graham Depo. at 75:14-76:24; Graham's

University of New Mexico Undergraduate Transcript; List of Persons Selected for Interviews

(showing Neal's graduate GPA of 3.52); E-mail from Neal Submitting Resume to Sandia.

According to Graham, Neal's minimum undergraduate GPA was the only reason why Sandia did not

interview Neal.  See Graham Depo. at 76:19-24.

Neal alleges that Sandia interviewed four other candidates, DPS, KSM, CJS, and CDW, all

below the age of 40, and it extended offers to three, despite having GPAs lower than the required

minimum.  Neal contends that, by relaxing the GPA requirement for younger applicants, Sandia

intentionally discriminated against older applicants in a protected class.

### a.    DPS.

DPS, age 34,[4] received his undergraduate degree in 1995 and his graduate degree in 2001.

See List of Successful Candidates - 11/21/01.  DPS had an undergraduate degree of 3.13 and a

graduate degree of 3.2, both under the required minimums.  See Graham Depo. at 24:5-26:1; List

of Successful Candidates - 11/21/01.  DPS interviewed for the LTE position on November 19 or 20,

2001, and Sandia extended him an offer January 21, 2003.  See List of Successful Candidates -

11/21/01.

Although Sandia contends that the GPA requirements do not apply to the position LTE

positions, see Graham Decl. ¶ 21, at 5, Neal alleges that Sandia did, in fact, apply the GPA

requirement to LTE positions.  In support of this contention, Neal cites a portion of Graham's

_____

[4] The given age of the candidates is for when Sandia extended them offers, or, in CJS' case,
when interviewed.

deposition in which he stated: "I did not want to hire somebody in at the LTE level that we subsequently would not been [sic] able to convert to an FTE position.  We make a huge investment in training, and it seemed to me that it was not wise to do that."  Graham Depo. at 24:5-25; Graham Decl. ¶ 22-24, at 5-6.  In response, Sandia noted that Graham is not the only decisionmaker in the hiring process and that the hiring manager can overrule his opinion as to the appropriate weight to accord to the LTE candidate's GPA.  See Graham Decl. ¶ 24, at 6.  In particular, in DPS' case, Graham recommended that Sandia not hire DPS because of his GPA, but the hiring manager overruled this opinion and hired DPS anyway.  See Graham Depo. at 24:14-15, 24-25; 25:13-17; 26:20-21.

### b.    KSM.

Next, Neal alleges that KSM was a preferentially treated younger individual.  KSM, age 33, received her undergraduate degree in 1994 and graduate degree in 2002.  See List of Successful Candidates - 11/21/02; List of Successful Candidates - NM20362.  Like DPS, KSM interviewed for a LTE buyer position on November 19 or 20, 2001.  Sandia made KSM an offer for the LTE position on December 19, 2001, when KSM was 31-years old.  See List of Successful Candidates - 11/21/01. Also, KSM applied for an FTE buyer position in the fall of 2002, and Sandia hired him on January 30, 2003, at the age of 33.  KSM had an undergraduate GPA of 3.15 (which Sandia rounded up to satisfy the minimum 3.2 undergraduate GPA hiring requirement), and a graduate GPA of 3.57.  See Graham Depo. at 32:5 - 33:6; List of Successful Candidates - NM20362.

### c.    CJS.

Another individual, CJS, age 27, received his undergraduate degree in 1998 and graduate degree in 2002.  See List of Persons Selected for Interviews.  CJS received an interview despite

having a 3.1 undergraduate GPA, which was below Sandia's required minimum.  See Graham Depo. at 79:14 - 83:1; List of Persons Selected for Interviews.  Sandia did not, however, extend CJS an offer.  See Graham Depo. at 82:18-19; Graham Depo. Corrections, at 2.   Graham later explained in his corrections to his deposition that Sandia gave CJS an interview, even though Sandia knew his GPA was below the minimum, because CJS was the son of a retired Sandia manager.  See List of Persons Selected for Interviews; Graham Depo. at 82:18-19; Graham Depo. Corrections, at 2. Despite this explanation, Neal alleges that Sandia treated a 27-year old individual more favorably than a 45-year old.

### d.  CDW.

Finally, Sandia hired an individual identified as CDW, age 34, for the same FTE position for which Sandia considered Neal in the fall of 2002.  CDW received her undergraduate degree in 1991, began working at Sandia in March of 1997, and received her graduate degree in 1998.  See List of Successful Candidates - NM20362.  Although CDW's FTE position came five years after the date she received her graduate degree, she nevertheless fits in the 80-percent entry-level hiring preference because, when originally hired as a LTE, CDW was a recent graduate and Sandia was considering her for a regular employment offer.  See List of Successful Candidates - NM 20362; Woodard Memo ¶ 5, at 2.

Both CDW's undergraduate and graduate GPS were below the required minimum.  See id. In graduate school, CDW had a GPA of 3.28.  See CDW's Application for Employment (dated May 7, 2003).  Despite a dispute over her undergraduate GPA, it is clear that it was well below the minimum requirement of 3.2.  See List of Successful Candidates - NM20362 (listing CDW's undergraduate GPA as 2.8, prepared in response to Plaintiff's Interrogatory No. 4); CDW's

Application for Employment (listing an undergraduate GPA of 2.33).  Neal alleges that, because Sandia's counsel prepared the List of Successful Candidates showing the higher GPA in response to Neal's Interrogatory No. 4, it lacks the reliability of the first hand knowledge found in CDW's Application for Employment.

Sandia justifies its hiring of CDW as a FTE buyer because Sandia already  employed CDW as an LTE.  See List of Successful Candidates - NM20362.  In addition, CDW's application for the FTE position included a one-and-a-half page descriptive memorandum explaining that her low GPAs were on account of working throughout school.  See Selection Justification Memo Template at 1.  The memorandum also expresses confidence in CDW's ability to perform at the same level of other candidates.  See id. at 2.

In summary, Neal contends that Sandia did not hold the four substantially younger individuals to the same minimum GPA requirements to which it held Neal and recognized them as recent graduates under Sandia's preferential hiring policy.  Therefore, according to Neal, Sandia's preferential treatment of those individuals is further evidence of the intentional age discrimination that resulted from its 80/20 hiring policy.  Simply stated, Sandia gave recent graduates between the ages of 27-34 a break on the GPA requirements.

At his deposition, Neal stated that he had "no idea" whether any Sandia hiring preference policies played a roll in the filling of the buyer positions that he sought.  Neal Depo. at 78:17-79:2.  At the time that Sandia took his deposition, however, Neal was not fully aware of the evidence regarding the preferential treatment of the four substantially younger recent graduates.  Now that discovery is concluded, Neal alleges he uncovered evidence that shows Sandia does not hold substantially younger recent graduates to the same GPA minimum requirements as it applied to Neal

and applies the 80/20 hiring policy to the MLS positions.  Based on this evidence, Neal alleges that a Sandia hiring preference played a role in filling the buyer positions that he sought.

At the time of his deposition, Neal assumed that the hiring preference policy applied to all permanent positions at Sandia.  See Neal Depo. at 78:10-16.  While Neal may have assumed at the start of discovery that a hiring preference policy applied to all permanent positions at Sandia, Neal now contends that the evidence proves that a Sandia hiring preference applied to the positions that he was seeking, LTE as well as FTE positions.

## PROCEDURAL BACKGROUND

On October 31, 2002, Neal filed an charge with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful age discrimination.  Neal complained of Sandia's decision to not interview or hire him, i.e., as a professional level MLS buyer, during fiscal year 2002.  See EEOC Charge; EEOC Affidavit and Intake Questionnaire (dated October 31, 2002).  Neal's EEOC charge mentions only that he was complaining of not being hired or interviewed for a "buyer position" at Sandia.  At the time he filed the EEOC charge, Neal was unaware of any "MLS" buyer description assigned to the buyer positions that he was seeking and the job postings for which he was submitting his resume did not mention any MLS classification.  See Buyer job posting; Response ¶ 2.

Neal's EEOC charge of discrimination challenged Sandia's alleged policy of giving preference for hiring to individuals who received a degree no more than three years before applying for employment.  See EEOC Charge; EEOC Affidavit and Intake Questionnaire.  Neal also included in his EEOC charge a more general claim that he believed Sandia had discriminated against him on the basis of age -- 45 -- in violation of the ADEA of 1967.  See EEOC Charge; 29 U.S.C. §

-16-

631(a)(defining the protected class as age 40 and above).

In addition to challenging Sandia's failure to hire him because of Sandia's alleged policy of giving preference for hiring to individuals who recently received a degree,  see Complaint ¶¶ 9-11, at 2; IPTR at 1, 2; EEOC Intake Questionnaire; Response ¶ 1, at 1, Neal also alleges that Sandia discriminated against him on the basis of his age, see EEOC Charge; Complaint ¶ 11, at 2; Response ¶ 1, at 1-2.  Neal seeks liquidated damages based on both of these claims.  See Complaint at 3; Plaintiff's Answers to Defendant's First Set of Interrogatories, Answer to Interrogatory No. 12 (dated October 8, 2003).  At the time Neal filed his Complaint, he believed that the discrimination was evidenced by a hiring policy that gave preferential treatment to recent graduates.  See Complaint ¶ 9, at 2.  During discovery, Neal obtained evidence that he believes shows that Sandia did not hold four substantially younger individuals, who were also recent graduates, to the same GPA minimum requirements for interviews and hiring to which it held Neal.  See Response ¶ 5, at 3.  Neal also uncovered evidence that one individual, CDW, age 34, got the position for which Sandia turned Neal down, even though CDW had undergraduate and graduate GPAs below the hiring standard and lower than Neal's.  See List of Persons Selected for Interviews (showing CDW's and Neal's graduate GPAs); Neal's University of New Mexico Undergraduate Transcript; E-mail from Neal Submitting Resume to Sandia (listing Neal's graduate GPA); Letter from Sandia's Legal Dept. to Attorney Thomas E. Chism (May 16, 2003)(showing Neal's undergraduate GPA).

## LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-

moving party must contradict facts that the movant specifically avers.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  The court must deny a motion for summary judgment when a genuine issue of material fact remains to be tried, or where the moving party is not entitled to a judgment as a matter of law.  See Kennedy v. Silas Mason Co., 334 U.S. 249, 252 (1948).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  The moving party can meet the burden by highlighting for the court an insufficiency of evidence as to an essential element of the nonmovant's claim.  See id.  Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 324).  The non-moving party may not rest on his pleadings but must set forth specific facts.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Under rule 56(e), only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief.  See Tavery v. United States, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)(citations omitted).  "A plaintiff cannot create a triable issue of fact by making an assertion without supporting facts."  Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1177 (10th Cir. 2000).

For the purposes of summary judgment, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated

against the plaintiff," the court should deny summary judgment.  MacDonald v. Eastern Wyoming Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991)(quoting Palucki v. Sears, Robueck & Co., 879 F.2d 1568, 1570 (7th Cir. 1989)).

The court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  A "genuine" factual dispute requires the non-moving party to show more than a mere scintilla of evidence to overcome a motion for summary judgment.  Id. at 252.

The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

The non-movant cannot defeat a summary judgment motion simply by expressing the intent to challenge the credibility of a moving party's witness.  See Kelley v. Goodyear Tire & Rubber Co., 220 F.3d at 1177 (holding that, to avoid summary judgment, the non-moving party "must supply evidence of a question of fact for the case to go to the jury).  See also Coleman v. Quaker Oats Co.,

232 F.3d 1271, 1289 (9th Cir. 2000)(holding that asserting that a witness' statement may be disbelieved by the jury is not sufficient to withstand summary judgment); Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1997)(holding that allowing summary judgment to be overcome by the non-movant's belief that he will be able to discredit a witness in cross-examination would render "summary judgment itself a dead letter, rather than the essential screening device it has become for litigation today"); Thomas v. Runyon, 108 F.3d 957, 961 (8th Cir. 1997)("In order to defeat the [summary judgment] motion, plaintiff must develop some evidence or argument going beyond possible self-interest of the witness.").

The court also may not consider hearsay evidence when deciding a motion for summary judgment.  See Macuba v. DeBoer, 193 F.3d 1316, 1322-23 (11th Cir. 1999).

## LAW ON EMPLOYMENT DISCRIMINATION

### I.      PRIMA FACIE CASE OF INTENTIONAL AGE DISCRIMINATION.

A plaintiff shows a prima facie case of intentional age discrimination if he or she establishes that he or she (i) was within the protected age group at the time of the employment action; (ii) was qualified for the position; and (iii) was treated less favorably than a younger person.  See Furr v. AT&T Tech., Inc., 824 F.2d 1537, 1542 (10th Cir. 1987).  Once the plaintiff introduces evidence on these three factors, the burden shifts to the defendant to offer a nondiscriminatory reason for the employment decision.  See Furr v. AT&T Tech., Inc., 824 F.2d at 1542.  If the employer offers a nondiscriminatory reason for the employment decision, the plaintiff still carries the burden of persuasion and must demonstrate that the defendant's proffered explanation is mere pretext.  See Furr v. AT&T Tech., Inc., 824 F.2d at 1542.  A plaintiff can demonstrate pretext by presenting evidence that the reasons offered by the employer are so weak, implausible, inconsistent, incoherent

or contradictory as to support a reasonable inference that the employer did not act for those reasons.

See Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1977).

However, "just because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual." Randle v. City of Aurora, 69 F.3d 441, 455 (10th Cir. 1995). The court's "role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments'." Jones v. Barnhart, 349 F.3d 1260, 1267 (10th Cir. 2003)(quoting Simms v. Okla. Ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1329 (10th Cir. 1999)). The Tenth Circuit's discussion concerning Title VII is equally applicable to the ADEA:

> Not every difference in treatment, of course, will establish a discriminatory intent.
>
>> Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination based upon an employee's protected class characteristics. Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations. . . . What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.
>
> [EEOC v.] Flasher, 986 F.2d [1312,] 1319 [10th Cir. 1992]. Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext. See id. at 1320.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1232 (10th Cir. 2000)(quoting EEOC v. Flasher Co., 986 F.2d at 1319-20). "The relevant inquiry is not whether [the employer's] proferred reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith on those beliefs." Bullington v. United Air Lines, 186 F.3d 1301, 1318 (10th Cir.

-21-

1999)(overruled on other grounds by Boyler v. Cordant Technologies, Inc., 316 F.3d 1137, 1140

(10th Cir. 2003)).

A showing of pretext is evidence from which a jury can infer discriminatory intent. See

Randle v. City of Aurora, 69 F.3d at 451. Courts "must 'exercise particular caution before

[sustaining] summary judgment[s] for employers on such issues as pretext, motive, and intent.'"

Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001)(quoting Santiago-Ramos v.

Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000)). To survive summary judgment,

however, the non-movant must present sufficient evidence "to raise a genuine doubt about

Defendant's motivation." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1200 (10th Cir.

2000). Summary judgment in favor of the employer is warranted only if the non-moving party has

"'failed to produce any evidence from which a reasonable inference could be drawn' that the

[employer's] proffered reasons were pretextual." Salguero v. City of Clovis, 366 F.3d 1168, 1176

(10th Cir. 2004)(quoting Foster v. Alliedsignal, Inc., 293 F.3d 1187, 1196 (10th Cir. 2002)).

A plaintiff may demonstrate pretext by showing that he was treated differently than other

similarly situated individuals. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230

(10th Cir. 2000). However, "[t]he burden is on the plaintiff to demonstrate he is similarly situated

to the employees to whom he is comparing himself." Kelley v. Goodyear Tire & Rubber Co., 220

F.3d at 1178. If the facts demonstrate significant differences among the employees that are allegedly

similarly situated, the plaintiff has failed to make a sufficient showing of pretext. See Salguero v.

City of Clovis, 366 F.3d at 1177.

In regard to a plaintiff's intent to challenge the credibility of a defendant's witness as the

basis for establishing a genuine issue of a material fact, the Ninth Circuit's discussion in Lindahl v.

-22-

Air France is instructive:

> The plaintiff cannot carry this burden [of raising a genuine factual question as to whether the proffered reason is pretextual] by restating the prima facie case and expressing an intent to challenge the credibility of the employer's witnesses on cross-examination.  She must produce specific facts directly evidencing a discriminatory motive or showing that the employer's explanation is not credible.

930 F.2d 1434, 1437-38 (9th Cir. 1991).

## II.   USE OF DISPARATE IMPACT TO ESTABLISH INTENTIONAL DISCRIMINATION.

Under the current law of the United States Court of Appeals for the Tenth Circuit, disparate impact claims cannot be brought under the ADEA.  See Ellis v. United Airlines, Inc., 73 F.3d 999, 1001 (10th Cir. 1996).[5]  The Tenth Circuit has ruled, however, that, although disparate impact claims regarding facially neutral hiring policies causing unintentional age discrimination are not cognizable under the ADEA, disparate impact may be evidence of intentional discrimination.  See Furr v. Seagate Tech. Inc., 82 F.3d 980, 987 n.4 (10th Cir. 1996)(recognizing that "disparate impact may be evidence of intentional discrimination in certain cases," but holding the plaintiff failed to establish that the hiring criteria was correlated to age)(citing Hiatt v. Union Pacific RR Co., 65 F.3d 838, 842 n.4 (10th Cir. 1995)(noting that "the disparate impact of a seniority system may nonetheless be evidence of intentional discrimination")); Harvey v. United Transp. Union, 878 F.2d 1235, 1242-44 (10th Cir. 1989)(holding that "a finding of discriminatory intent can be based on indirect, circumstantial evidence including evidence of discriminatory impact").  To therefore use disparate

---

[5] The Supreme Court granted *certiorari* in Smith v. Jackson, 351 F.3d 183 (5th Cir. 2003), cert granted,124 S.Ct. 1724 (March 29, 2004), a decision from the United States Court of Appal for the Fifth Circuit held that disparate impact claims could not be brought under the ADEA, to resolve the Circuit split over this issue.  Because the Supreme Court has not issued a ruling on this issue, this Court must adhere to the Tenth Circuit precedent of Ellis v. United Airlines, Inc..

impact to show intentional discrimination, the plaintiff must demonstrate that he was the victim of disparate treatment on the basis of his age.  See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)("In a disparate impact case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.").

## ANALYSIS

### I.    PARTIES' CONCESSIONS.

In the hearing on the Motion for Summary Judgment, the parties made several concessions that dispose of some of the arguments presented in the briefing.  First, Sandia concedes that Neal had made a prima facie case of discrimination, and, after offering legitimate, non-discriminatory reasons for Sandia's decision, the remaining inquiry in this Motion is whether such reasons are mere pretext. See Tr. at 6:1 - 10:1.  Next, Neal concedes that, under current Tenth Circuit law, disparate impact claims cannot be brought under the ADEA.  See Tr. at 10:24 - 12:9.  Instead, the only issue is whether there is any evidence of disparate impact to support a finding of intentional age discrimination.  By conceding that the disparate impact claim is unviable in this Circuit, the discussion on standing is also no longer an issue in this Motion.

### II.   SANDIA'S WITNESSES' DECLARATIONS ARE NONHEARSAY STATEMENTS BECAUSE THEY ARE NOT OFFERED TO PROVE THE TRUTH OF THE MATTER ASSERTED.

Neal alleges that statements within Graham and Palmer's declarations are inadmissible hearsay and that the Court, therefore, must be strike them from the record.  The statements at issue involve discussion of the applicability of the 80/20 hiring policy to the MSL buyer positions.

Paragraph 6 of Palmer's Declaration refers to an out-of-court communication made in or around November of 2000 to Palmer from an unidentified individual or individuals at Fegueroa's

-24-

office.  See Palmer Decl. ¶ 6, at 2.  Neal contends this out-of-court statement is hearsay because Sandia is offering it as proof that the 80/20 hiring policy no longer applied to MLS positions at that time.  See Response ¶ 18, at 8.  Neal asserts that, if Sandia had submitted a declaration from Fegueroa's office regarding the alleged change in the applicability of the recent graduate hiring preference for MLS positions, there would be no hearsay problems.  Furthermore, Sandia did not disclose anyone from Fegueroa's office in its initial disclosures or in the IPTR as a witness.

Paragraphs 13-14 and 17-19 of Graham's Declaration refer to an out of court verbal communication from Sherri Clark to Graham on January 31, 2002.  See Graham Decl. ¶¶ 13-14, 17-19, at 3-5.  As with Palmer's statements, Neal contends that Sandia is offering this communication as proof that the recent graduate hiring preference no longer applied to MLS positions.  See Response ¶ 18, at 8.  Neal contends that the statements contain hearsay and that the Court should strike the statements.  Neal asserts that, if Sandia had submitted a declaration from Clark regarding the alleged change in the applicability of the recent graduate hiring preference for MLS positions, there would be no hearsay problems.  Furthermore, Sandia did not disclose Clark in its initial disclosures or in the IPTR as a witness.  Neal argues that the fact Graham made notes at the time of his conversation with Clark does not negate the communication's hearsay status, and that the note itself contains Clark's hearsay.

Neal contends that the statements are out-of-court statements by a non-party that Sandia offers for the proof of the matter asserted, i.e., that the policy did not apply to buyer positions.  A court, when reviewing evidence put before it on a motion for summary judgment, may not consider hearsay statements.  Macuba v. DeBoer, 193 F.3d at 1322-23 (11th Cir. 1999).  Sandia, however, does not offer the contested statements for the truth of the mattered asserted, but rather to indicate

the decisionmakers' understanding about the applicability of the policy, regardless whether such understanding was correct. See Fed. R. Evid. 801. Because the statements are not offered for the truth of the matter asserted, they are nonhearsay and admissible evidence properly before the Court for the limited purpose for which they are offered.

## III.    NEAL FAILED TO MEET HIS BURDEN OF PROOF BY NOT RAISING A GENUINE ISSUE OF MATERIAL FACTS AS TO WHETHER SANDIA'S ACTIONS WERE PRETEXTUAL.

Neal alleges there is a genuine issue of material fact whether Sandia's reasons for not interviewing or hiring him were mere pretext. Neal, however, fails to meet his burden of proof by not presenting evidence establishing a genuine issue as to Sandia's actions. Because there is no genuine issue of material fact as to the issue of pretext, the Court will grant the Defendant's Motion for Summary Judgment.

There are several facts that the Court assumes to be true, and therefore undisputed, for the purposes of this Motion. First, the interviews on November 19 and 20, 2001 occurred before Neal applied to Sandia for the LTE position. Therefore, because Sandia did not consider Neal for the position that Sandia eventually hired DPS, Neal's contention that DPS was a similarly situated comparable must fail. Next, all relevant decisionmakers at Sandia believed the 80/20 hiring policy did not apply to LTE or FTE MLS positions. The remaining question, therefore, is whether Sandia applied the GPA requirement for the FTE position in such a way that there is a genuine issue of material fact whether Sandia's reasons are pretextual.

Neal advances three reasons for why Sandia's reasons for not interviewing and hiring him, in light of his GPA, are pretext. Because Neal does not raise a genuine issue of material fact as to

-26-

any of these three offered reasons, the Defendant is entitled to summary judgment.

### A.     80/20 HIRING POLICY.

Neal offers no evidence to rebut Sandia's showing that all relevant decisionmakers believed, at the time Neal was considered for a position, that the 80/20 hiring policy did not apply to MLS buyer positions.  Because the relevant decisionmakers did not believe the policy applied to the positions for which he applied, Neal fails to raise any issue of a material fact on the issue of pretext. Neal and Sandia both refer to statistics of hires in an attempt to support the applicability or non-applicability of the 80/20 hiring policy to the MLS positions.  However, because the Court has found that the decisionmakers did not believe the 80/20 policy applied, this evidence does not create a genuine issue of material fact on the issue of pretext.

### B.     JURY'S POSSIBLE DISBELIEF OF DEFENDANT'S WITNESSES' TESTIMONY.

Despite Neal's contentions that, because Graham and Palmer are interested witnesses, a jury must resolve the issue of their credibility,  Neal does not to offer any evidence to create a genuine issue of material fact that would defeat the summary judgment motion.  As the Tenth Circuit explained in <u>Kelley v. Goodyear Tire & Rubber Co.</u>, the non-moving party cannot simply express the intent to challenge the credibility of the moving party's witnesses to overcome its burden and escape summary judgment.  <u>See</u> 220 F.3d at 1274.  Nor can the plaintiff defeat a motion for summary judgment simply by relying on mere conjecture that the employer's nondiscriminatory reasons are pretextual.  <u>See</u> <u>Branson v. Price River Coal Co.</u>, 853 F.2d at 772.  Because Neal offers no evidence to rebut the statements that Graham and Palmer made, and instead relies only on impugning their credibility at trial, he has failed to present the requisite specific facts indicating a discriminatory

intent or motive by Sandia.

### C.     THE GPA REQUIREMENT.

Neal alleges Sandia applied its GPA requirement for FTE buyer positions in a discriminatory fashion, demonstrating Sandia's intentional age discrimination against applicants within the ADEA protected class (age 40 and above).  See 29 U.S.C. § 631(a).  Neal contends that four other applicants, DPS, KSM, CJS and CDW, all of whom are younger with GPAs less than the required minimum, were similarly situated to Neal but treated differently because of their age.  Even assuming that all four had GPAs below Sandia's required minimum, Neal's argument must fail because he failed to show that the four applicants were similarly situated to him.  See Kelley v. Goodyear Tire & Rubber Co., 220 F.3d at 1178.

### 1.     DPS.

Because Sandia hired DPS for a LTE buyer position, which is not subject to the GPA requirement or the 80/20 policy, DPS is not an appropriate comparable to support an allegation of discrimination by Sandia.  As Graham's declaration demonstrates, he has a personal preference of hiring LTE buyers that had a GPA meeting the FTE requirements.  Graham was not, however, the only hiring supervisor, and the hiring manager can overrule his opinion as to the importance of an applicant's GPA.  Thus, even though there is some testimony regarding a preference for applicants with higher-GPAs, there is no minimum GPA for the LTE position.  Therefore, Neal's allegations that the GPA minimum requirement was applied in a discriminatory fashion to the LTE positions must fail.

In addition, DPS is not an appropriate comparable because Neal was not considered for the position for which Sandia hired DPS.  As discussed above, the Court finds that, when Neal submitted

his resume on November 21, the hiring committee did not consider it for the interviews it conducted on November 19 and 20, 2001, or for the positions it offered based on these interviews in December of 2001 and January of 2002.  Because Sandia interviewed and hired DPS for a position for which it did not consider Neal, DPS is not an appropriate comparable to support Neal's allegations of intentional age discrimination.

> **2.     KSM.**

Sandia hired KSM, like DPS, for an LTE position after interviewing him in November, 2001.  Also, Sandia did not consider Neal for KSM's LTE position, like it did not consider Neal for DPS' position, because Sandia interviewed and offered the job to KSM before Sandia considered Neal's resume.

In addition, when KSM successfully applied for a FTE position with Sandia, he was already a Sandia employee working as an LTE buyer.  Therefore, because Sandia did not consider Neal's application for the LTE position that Sandia offered KSM, and because when KSM applied for the FTE position he was already an employee with Sandia,  KSM is not an appropriate comparable.

> **3.     CJS.**

CJS is an invalid comparable as well, because although there was an interview, there was no offer or hiring.  Sandia granted CJS a legacy interview because he was the son of a retired employee of Sandia.  Without a hiring for the position to which Neal applied, there can be no proper parallel drawn between CJS and Neal.

> **4.     CDW.**

CDW is also not a valid comparable because she was not similarly situated to Neal.  First, unlike Neal, CDW was an existing Sandia LTE employee when she applied for the FTE position.

CDW's application to the FTE position included a lengthy justification memorandum explaining that, despite her GPA, her performance would match other qualified applicants. Because Sandia already employed CDW, whereas Neal was not an employee, Neal failed to meet its burden of proof under Kelley v. Goodyear Tire & Rubber Co. that CDS and Neal were similarly situated.

At most, the difference in treatment between CDW and Neal suggests an inconsistent application of the GPA requirement to the FTE position. The Tenth Circuit, however, has held that not every difference in treatment will establish discriminatory intent. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1232. This Court's role is not to remedy trivial, accidental, or even inconsistent treatment of employees, especially in the context of large employers like Sandia. See id. Instead, it is to evaluate whether the employer honestly believed the nondiscriminatory reasons for the employment decision and acted in good faith in accordance with those reasons. See Bullington v. United Air Lines, 186 F.3d at 1318. Because Sandia believes the reasons for hiring CDW despite her GPA, even if mistaken or not wise business judgment, it is not enough to establish pretext. See Randle v. City of Aurora, 69 F.3d at 451.

### D.     CANDIDATES IN THE PROTECTED-AGE CLASS.

In addition to these four candidates, Sandia also offered LTE and FTE positions to three applicants over 40-years old during the fiscal year 2002. Sandia converted CBS and BDL to FTE positions in January and February of 2002, respectively. Sandia offered SMG a LTE position on April 8, 2002. Neal alleges that SMG, BDL and CBS are not valid comparables because Sandia never considered Neal for the particular positions they sought. Neal urges, however, that other applicants not in the protected age class -- DPS and KSM -- are suitable comparables, even though Sandia did not consider him for their positions. Neal's position on which candidates are proper

comparables -- candidates to which Sandia made offers in the fiscal year or candidates Sandia considered for a particular position -- is, therefore, inconsistent.

Regardless which applicant pool the Court considers, however, Neal does not demonstrate a genuine issue of material fact.  If the Court compares Neal to the applicants for which Sandia considered him for a position, then Neal does not point to evidence creating a genuine issue of material fact as to pretext.  If, however, the Court considers all candidates Sandia hired for LTE and FTE MLS positions during the fiscal year, Sandia's hiring of three applicants in the age-protected class undercuts a finding of pretext.

In summary, because Neal fails to present any evidence that creates a genuine issue of material fact as to Sandia's nondiscriminatory reasons for not interviewing or hiring him, the Court will grant Defendant's Motion for Summary Judgment.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgement is granted, and that the Plaintiff's claims are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Thomas E. Chism
Albuquerque, New Mexico

       *Attorney for the Plaintiff*

Lawrence S. Greher
Senior Attorney
Sandia National Laboratories
Albuquerque, New Mexico

*– and –*

Stephen T. LeCuyer
Mettler & LeCuyer, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*